# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JAMAL MURRAY,
    Plaintiff,

vs.

OHIO DEPARTMENT OF
CORRECTIONS, et al.,
    Defendants.

Case No. 1:14-cv-168
Black, J.
Litkovitz, M.J.

**ORDER AND REPORT
AND RECOMMENDATION**

    Plaintiff, a former inmate at the Lebanon Correctional Institution (LeCI) in Warren

County, Ohio, brings this civil rights action pursuant to 42 U.S.C. § 1983 against defendants

Amy Weiss, Dr. Timothy Heyd, Nurse Christopher Carnes, Oscar Cataldi, Jr., Mary Kokenge,

Stanley Richard Benner, and Shellie Hodges-Begunish alleging claims of deliberate indifference

to his medical needs and First Amendment retaliation during the time of his incarceration. This

matter is before the Court on plaintiff's motion to strike certain declarations included in

defendants' motion for summary judgment (Doc. 111) and defendants' response in opposition

(Doc. 115). This matter is also before the Court on defendants' motion for summary judgment

(Doc. 96), plaintiff's response in opposition (Doc. 110),[1] plaintiff's supplement in opposition

(Doc. 114), defendants' reply memorandum (Doc. 119), and plaintiff's sur-reply (Doc. 122).

## I. Motion to Strike (Doc. 111)

    Plaintiff moves to strike certain statements in the declarations submitted by defendants in

support of their motion for summary judgment that he considers to be undisclosed expert

testimony in violation of Federal Rule of Civil Procedure 26(a). (Doc. 111 at 1). Plaintiff

contends that defendants have represented that they did not plan to name any expert witnesses or

---

[1] Plaintiff has indicated that he does not oppose summary judgment as to defendants Oscar Cataldi, Jr. and Mary Kokenge. (Doc. 110 at 2). Accordingly, the Court should grant summary judgment for these defendants.

offer expert testimony. (*Id.* at 2). Plaintiff asserts that defendants' motion for summary judgment contains undisclosed expert opinions offered by defendants Dr. Heyd and Dr. Cataldi. (*Id.*) (citing Doc. 96 at 11, 14). Plaintiff also asserts that defendants Heyd and Cataldi have offered undisclosed expert statements in their declarations. (*Id.* at 2-3) (citing Heyd Declaration, Doc. 96-7 at ¶¶ 6 (last sentence), 22, 23, 27, 28, 29, 41, 42; Cataldi Declaration, Doc. 96-8 at ¶¶ 25, 26). Plaintiff also contends that the declarations of Assistant Chief Inspectors Karen Stanforth and Antonio Lee from the Ohio Department of Rehabilitation and Corrections contain undisclosed expert opinions and legal conclusions that plaintiff allegedly failed to exhaust his administrative remedies. (*Id.* at 3) (citing Stanforth Declaration, Doc. 96-9; Lee Declaration, Doc. 96-10). Plaintiff argues that this "belated use of expert testimony" is "highly prejudicial" to him because he had no opportunity to question Dr. Heyd, Dr. Cataldi, Ms. Stanforth, or Mr. Lee on the testimony offered in their declarations. (*Id.* at 4).

In response, defendants assert that defendants Heyd and Cataldi are party defendants who are exempt from the expert witness disclosure requirements of Rule 26(a). (Doc. 115 at 2). Defendants contend that no case law from the Sixth Circuit reflects that a party defendant must be treated as an expert witness under Rule 26, and courts outside the Circuit to have addressed the issue have concluded that defendant parties, even while experts in their profession, are not required to be disclosed as experts under Rule 26. (*Id.*). Defendants also assert that plaintiff deposed Drs. Heyd and Cataldi. (*Id.* at 3). Defendants further contend that the information contained in the declarations of Inspectors Stanforth and Lee does not constitute expert opinions. (*Id.*). Defendants state that these declarations explain the Ohio Department of Rehabilitation and Correction ("ODRC") grievance process outlined in Ohio Administrative Code § 5120-9-31, certify the grievance records, and explain why ODRC determined that plaintiff did not exhaust

his administrative remedies. (*Id.*). Defendants contend that the inspector declarants are "simply providing the results of their mandated finding on exhaustion" as part of their inspector duties and are not providing legal conclusions. (*Id.* at 4).

Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose to an opposing party the identity of any witness it may use to present expert testimony. Fed. R. Civ. P. 26(a)(2)(A). In addition to the disclosure of each expert's identity, the disclosure must be "accompanied by a written report" containing certain specific information required by Fed. R. Civ. P. 26(a)(2)(B). A party must make these disclosures at the time and in the sequence that the court orders. Fed. R. Civ. P. 26(a)(2)(D). "District courts have broad discretion to exclude untimely disclosed expert-witness testimony." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

Paragraphs 6 (last sentence), 22, 23, 27, 28, 29, 41, and 42 of the Heyd declaration and paragraphs 25 and 26 of the Cataldi declaration constitute undisclosed expert testimony that must be stricken from the record. Although Dr. Heyd and Dr. Cataldi are party defendants and treating physicians who provided plaintiff with medical care at LeCI, the information contained in these paragraphs of their declarations does not relate to the facts they learned in the course of treating plaintiff's medical condition. *See Fielden v. CSX Transportation, Inc.*, 482 F.3d 866, 871 (6th Cir. 2007) (Under Rule 26, a "report is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment."). Rather, their statements purport to offer medical expert opinion testimony on plaintiff's medications and plaintiff's underlying medical conditions, supported by expert case studies and articles. Defendants' failure to disclose these expert statements is highly prejudicial to plaintiff. Defendants are correct that plaintiff took the depositions of and had the opportunity to question

3

both Drs. Heyd and Cataldi. However, plaintiff took their depositions on June 6, 2017—over a year before Drs. Heyd and Cataldi executed their declarations on August 21, 2018 and August 20, 2018, respectively. (Docs. 96-7, 96-8, 102, 105). There is no indication that the information contained in Drs. Heyd and Cataldi's declarations was available to plaintiff at the time of the June 2017 depositions. A review of the deposition transcripts and related exhibits (plaintiff's medical records) from Drs. Heyd and Cataldi's depositions reveals that plaintiff had no opportunity to question these defendants about the expert opinions and case studies contained in paragraphs 6 (last sentence), 22, 23, 27, 28, 29, 41, and 42 of the Heyd declaration and paragraphs 25 and 26 of the Cataldi declaration. (*See* Docs. 102, 105). Accordingly, plaintiff's motion to strike is granted as to paragraphs 6 (last sentence), 22, 23, 27, 28, 29, 41, and 42 of the Heyd declaration and paragraphs 25 and 26 of the Cataldi declaration, and these paragraphs will not be considered in deciding defendants' motion for summary judgment.

With respect to the declarations on exhaustion of administrative remedies, the Court concludes that plaintiff's motion to strike should be granted as to the legal conclusions contained in paragraph 12 of the Stanforth declaration and denied as to the Lee declaration. As Assistant Chief Inspectors at the ODRC and the custodians of grievance documents, Ms. Stanforth and Mr. Lee are permitted to provide factual information on whether plaintiff complied with the ODRC's inmate grievance procedure set forth in Ohio Admin. Code 5120-9-31(K). In paragraph 12 of the Stanforth declaration, however, Ms. Stanforth concludes that plaintiff "failed to exhaust his administrative remedies" against defendants Heyd, Carnes, Nurse Benner, and/or Nurse Hodges-Begunish. (Stanforth Declaration, Doc. 96-9 at ¶ 12). Ms. Stanforth's statement in this regard amounts to a legal conclusion that is within the province of the Court. *See Chavez v. Carranza*, 559 F.3d 486, 498 (6th Cir. 2009) ("[a]n expert opinion on a question of law is

inadmissible"). Therefore, it must be stricken from the record. Ms. Stanforth's statement in paragraph 14 that plaintiff "failed to exhaust his administrative remedies" against defendants Cataldi and Kokenge is also a legal conclusion for the Court. However, given that plaintiff has indicated he does not oppose the grant of summary judgment to defendants Cataldi and Kokenge (*see* Plaintiff Response in Opposition, Doc. 110 at 2), it is unnecessary for the Court to strike this statement. It is also unnecessary for the Court to strike any statements contained in Mr. Lee's declaration. (Doc. 96-10). Mr. Lee's statement that plaintiff "failed to exhaust his administrative remedies for any claim of retaliation against Dr. Heyd and/or Amy Weiss" (Doc. 96-10 at ¶ 12) also amounts to a legal question for Court resolution. However, as explained *infra* in Section VII, plaintiff has failed to present facts or evidence in opposition to the summary judgment motion on his First Amendment retaliation claim, and he appears to be proceeding solely on his Eighth Amendment denial of medical care claim. (*See* Docs. 110, 114, 122). Therefore, the Court need not strike Mr. Lee's declaration regarding plaintiff's exhaustion of administrative remedies on his retaliation claim.

In sum, plaintiff's motion to strike is **GRANTED** as to paragraphs 6 (last sentence), 22, 23, 27, 28, 29, 41, and 42 of the Heyd declaration, paragraphs 25 and 26 of the Cataldi declaration, and the legal conclusion on exhaustion of administrative remedies contained in paragraph 12 of the Stanforth declaration.

## II. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986). Under Fed. R. Civ. P. 56(c), a grant of summary judgment is proper if "the depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). In reviewing a motion for summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotation marks omitted) (quoting *Anderson*, 477 U.S. at 255).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Cities Serv. Co.*, 391 U.S. at 289). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23 (1986).

## III. Facts[2]

### A. Plaintiff's Medical History

Plaintiff was an inmate at LeCI from October 2010 until about May 2014. (Amended Complaint, Doc. 61 at ¶ 1). Plaintiff received anticoagulant[3] medications during his incarceration as a result of a heart attack he suffered in 2008 from suspected cocaine use. (Heyd Declaration at ¶ 6; Doc. 96-2 at 14-16). Plaintiff had a history of acute and chronic deep vein thrombosis ("DVT") in his legs, conditions which involve blood clotting. (*Id.*). Plaintiff was on an anticoagulation treatment regimen of Coumadin, also known as warfarin. (Amended Complaint at ¶ 14; Doc. 96-2 at 3).

Plaintiff was hospitalized at the Ohio State University ("OSU") Medical Center and the Atrium Medical Center several times in 2011 for acute and chronic DVT. (Heyd Declaration at ¶ 7; Doc. 96-2 at 3, 5-12, 17-26, 28-30). In April 2011, plaintiff was diagnosed with Protein C deficiency and Protein S deficiency, which put him at a greater risk of blood clotting. (Amended Complaint at ¶ 21).[4] In July 2011, plaintiff's international normalized ratio ("INR") level was at a subtherapeutic 1.5. (Doc. 96-2 at 8). A final treatment report at OSU in July 2011 recommended that plaintiff be treated with lifelong anticoagulation therapy because plaintiff was "at a high risk of recurrent deep venous thrombosis." (Heyd Declaration at ¶ 7; Doc. 96-2 at 3;

---

[2] The following facts are derived from the evidence included in defendants' motion for summary judgment and plaintiff's opposition thereto. Because plaintiff has indicated he does not oppose summary judgment as to defendants Cataldi and Kokenge and has not articulated any facts or provided evidence supporting an Eighth Amendment deliberate indifference claim relating to his medical care after his February 6, 2012 cerebral blood clot, the Court will solely consider the medical evidence predating February 6, 2012. *See* Doc. 110 at 11 ("Defendants' careless inaction and reckless non-treatment of Mr. Murray over a period of seven months led to his cerebral thrombosis and blindness."); Doc. 114 at 3 ("Plaintiff does of course oppose summary judgment with respect to his claim that his February 2012 cerebral venous thrombosis, and his resulting loss of vision, were the result of Defendant's illegal and unconstitutional actions.").

[3] An anticoagulant is "a drug (blood thinner) that treats, prevents, and reduces the risk of blood clots breaking off and traveling to vital organs of the body. . . ." *See* https://www.medicinenet.com/anticoagulants_drug_class_of_blood_thinners/article.htm (last visited Jan. 16, 2019).

[4] Defendants have accepted this allegation of fact as undisputed. (Doc. 96 at 11).

Doc. 110-1 at 1). The hematology consult team advised that plaintiff receive "a fair trial of Coumadin with an INR ranging between 2.5 and 3." (Doc. 110-1 at 1).

## B. Plaintiff's Medical Treatment at LeCI in late 2011 and early 2012

On August 16, 2011, plaintiff had an INR level of 2.3. (Doc. 96-4 at 10). On November 15, 2011, Dr. Heyd treated plaintiff and noticed that he again had a recent INR level of 2.3. (Heyd Declaration at ¶ 17; Doc. 96-4 at 10). Dr. Heyd reviewed a recent ultrasound of plaintiff's legs, which, according to Dr. Heyd, revealed that anticoagulation therapy was progressing properly. (Heyd Declaration at ¶ 17). On November 21, 2011, Dr. Heyd ordered that plaintiff take 6.5 milligrams of Coumadin by mouth daily. (Id. at ¶ 18; Doc. 96-3 at 47). On November 30, 2011, plaintiff had an INR level of 2.1. (Doc. 110-2). On November 30, 2011, Dr. Heyd ordered a PT/INR test for two weeks later. (Heyd Declaration at ¶ 18; Doc. 96-3 at 47).

On December 19, 2011, Dr. Heyd ordered that plaintiff's Coumadin be held for two days and then resumed at 5.5 milligrams due to high INR test results on December 8, 2011 and December 14, 2011. (Heyd Declaration at ¶ 18; Doc. 96-3 at 46). He also ordered a follow-up INR test to be conducted two weeks later. According to Dr. Heyd, no blood draw ever took place for the INR test to be conducted. (Heyd Declaration at ¶ 18). Contrary to Dr. Heyd's allegation, plaintiff had a blood draw on December 22, 2011, and his INR level was 1.3. (Doc. 110-3). This lab report is date stamped as "received" by LeCI on December 23, 2011. (Id.). On December 28, 2011, defendants allege that plaintiff did not show up for his appointment with Dr. Heyd or for his blood draw. (Heyd Declaration at ¶ 19; Doc. 96-1 at 4). Dr. Heyd ordered another INR test to be conducted in 10 days and continued plaintiff on his current dosage of Coumadin. (Heyd Declaration at ¶ 18; Doc. 96-5 at 5). On January 18, 2012, despite medical staff attempts to contact plaintiff, defendants allege that plaintiff missed a nursing appointment to

check his INR levels. (Heyd Declaration at ¶ 20; Doc. 96-1 at 4; Doc. 96-5 at 5).

On January 20, 2012, plaintiff reported to defendant Nurse Benner during a "nurse sick call assessment" that he had been experiencing headaches for four days, sinus drainage, coughing, and a scratchy throat. (Doc. 96-4 at 7-8; Declaration of Stanley Benner, Doc. 96-11 at ¶ 5). Nurse Benner assessed sinus drainage and cold symptoms. (Doc. 96-4 at 7). He provided plaintiff with cold tablets, ibuprofen, and cough syrup. (Benner Declaration at ¶ 5). Plaintiff was told to follow-up in three days if he did not feel better. (Doc. 96-4 at 8). Plaintiff visited Nurse Benner again on January 23, 2012. (Doc. 96-4 at 5-6; Benner Declaration at ¶ 6). Plaintiff reported that he started vomiting and his migraines continued despite drinking a lot of water. (*Id.*). Plaintiff demanded to see a doctor. (*Id.*). Nurse Benner again assessed cold symptoms and provided plaintiff with ibuprofen, cough syrup, and cold tablets. (*Id.*). Nurse Benner made a referral for plaintiff to see the LeCI doctor. (*Id.*). Nurse Benner attests that plaintiff did not present with any neurological deficits such as diminished strength, abnormal gait, speech issues, orientation issues, dissymmetry of the face, or other indicators. (Benner Declaration at ¶ 7). An eye examination performed on both visits showed no signs of neurological concerns. (*Id.*).

On January 28, 2012, plaintiff saw Nurse Shellie Hodges-Begunich during a "nurse sick call" assessment. (Declaration of Shellie Hodges-Begunich, Doc. 96-12 at ¶ 6; Doc. 96-4 at 3-4). Plaintiff complained of a headache and vomiting. (*Id.*). Nurse Hodges-Begunich assessed that plaintiff had a migraine, and she provided plaintiff with ibuprofen and Chlorphen. (*Id.*). She also made a referral for plaintiff to see the LeCI physician. (*Id.*). Nurse Hodges-Begunich attests that she found no neurological insufficiency or other acute symptoms of distress when examining plaintiff. (Hodges-Begunich Declaration at ¶ 7).

On January 31, 2012, Dr. Heyd examined plaintiff and observed signs and symptoms of viral and gastrointestinal illness with fever and chills. (Heyd Declaration at ¶ 25; Doc. 96-5 at 5; Doc. 96-3 at 46). Dr. Heyd administered an injection of Toradol, as well as Phenergan tabs, zantac, and ibuprofen. (*Id.*). Dr. Heyd's progress note from January 31, 2012 also states, "Hx due—√ PT/INR (overdue)." (Doc. 96-5 at 5).[5]

On February 3, 2012, plaintiff complained to Nurse Carnes that he felt woozy and his leg hurt. (Doc. 96-4 at 1). Nurse Carnes assessed that plaintiff exhibited health seeking behaviors and anxiety. (*Id.*). Plaintiff refused Tylenol. (*Id.*). Nurse Carnes advised plaintiff to use meditation and relaxation to relieve pain as well as over the counter medications. (*Id.* at 2). Nurse Carnes noted that plaintiff talked to another inmate in the infirmary without displaying symptoms of pain or discomfort. (*Id.*).

### C. Plaintiff's Stroke on February 6, 2012

On February 6, 2012, plaintiff was sent to the emergency room at Atrium Medical Center due to shortness of breath and headache and later transported to OSU Medical Center where he was diagnosed with cerebral venous thrombosis ("CVT"): a cerebral blood clot. (Heyd Declaration at ¶ 26; Doc. 96-3 at 2-37, 45; Doc. 96-5 at 4). Plaintiff was released from the hospital and continued taking anticoagulation therapy with aspirin and Coumadin. For several weeks prior to the stroke, plaintiff was sick with migraine headaches and did not eat. (Plaintiff Declaration, Doc. 100 at ¶ 7). On February 6, 2012, the pain in plaintiff's head was unbearable and he was seeing "triple." (*Id.* at ¶ 8). Plaintiff's vision became progressively worse after the stroke and he is now permanently legally blind. (*Id.*).

---

[5] Dr. Heyd omits this information from his declaration.

## IV. Eighth Amendment Inadequate Medical Care

The Sixth Circuit has analyzed claims for failure to provide adequate medical care under the Eighth Amendment deliberate indifference standard. *Wicker v. Lawless*, 278 F. Supp.3d 989, 1004 (S.D. Ohio 2017). A deliberate indifference claim under the Eighth Amendment has objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001). The objective component requires the existence of a "sufficiently serious" medical need. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A medical need is "sufficiently serious" if it either "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gunther v. Castineta*, 561 F. App'x 497, 499 (6th Cir. 2014) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

The subjective component requires an inmate to show that prison officials had "a sufficiently culpable state of mind" in providing inadequate medical care. *Farmer*, 511 U.S. at 834. "A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference." *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Gunther*, 561 F. App'x at 500 (quoting *Harrison*, 539 F.3d at 518). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). In sum, to prove the subjective component, the plaintiff must show that the official: (a) subjectively knew of a risk to the prisoner's health; (b) drew the inference that a substantial risk

of harm to the prisoner existed; and (c) consciously disregarded that risk. *Farmer*, 511 U.S. at 837.

Courts are reluctant to second guess medical judgments in cases involving inadequate medical treatment. *Richmond v. Huq*, 885 F.3d 928, 939 (6th Cir. 2018). Nevertheless, "treatment may be constitutionally impermissible when it is 'so woefully inadequate as to amount to no treatment at all.'" *Id.* (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). An inmate's "'disagreement with the testing and treatment he has received . . . does not rise to the level of an Eighth Amendment violation.'" *Rhinehart*, 894 F.3d at 740 (quoting *Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008) (in turn citing *Estelle*, 429 U.S. at 107)). Rather, the plaintiff must present evidence from which a reasonable jury could find that a prison official "consciously expos[ed] the patient to an excessive risk of serious harm." *Id.* at 738-39. A court must address the subjective component for each defendant individually. *Id.* at 743.

## A. Plaintiff had a "sufficiently serious" medical need

Defendants argue that plaintiff has failed to satisfy the objective component of his Eighth Amendment claim because although his blood clotting condition was "arguably serious," he has failed to show "how his condition was not adequately treated, and what sort of detrimental effect any alleged delay in medical treatment or alleged alternative course of treatment by the named defendants had on his condition." (Doc. 96 at 27-28). Defendants argue that plaintiff is "unable to provide a material fact beyond a conclusory allegation that it was a delay in medical treatment or an alternative course of treatment that caused a detrimental effect on his medical state." (*Id.* at 28). The Court disagrees.

The Sixth Circuit recognizes two distinct methods for establishing the objective

component of an Eighth Amendment claim. *Anthony v. Swanson*, 701 F. App'x 460, 463 (6th Cir. 2017). In one instance, a medical need may be sufficiently serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Blackmore*, 390 F.3d at 897). In instances where a prisoner's medical need is less obvious, a plaintiff must submit "verifying medical evidence to establish 'the detrimental effect of the [inadequate treatment].'" *Id.* (quoting *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)).

In this case, plaintiff has met his burden of providing "verifying medical evidence" establishing the objective component of an Eighth Amendment claim. The medical records document plaintiff's history with DVT and blood clots, including plaintiff's July 2011 discharge instructions from the OSU Medical Center, which recommend that plaintiff be treated with lifelong anticoagulation therapy and that he continue to be treated with Coumadin. (Doc. 96-2 at 3; Doc. 110-1). Defendants do not dispute that plaintiff suffered from a serious medical condition that necessitated medical care. (*See* Doc. 96 at 27). Rather, defendants argue that in order to satisfy the objective component, plaintiff must furnish evidence that his condition was not adequately treated and that a delay in medical treatment caused a detrimental effect to his condition. (*See id.* at 28). Plaintiff has presented this evidence. Plaintiff has presented an expert opinion from Dr. Jack Goldberg, M.D., FACP, who opined that Dr. Heyd and his medical staff at LeCI failed to adequately monitor and treat plaintiff's blood clotting condition, which led to plaintiff's cerebral blood clot. (Doc. 99-1). Plaintiff also presents the expert opinion of Dr. Frederick Fraunfelder, M.D., M.B.A., who opined that plaintiff's cerebral blood clot ultimately caused plaintiff's blindness. (Doc. 99-2). More specifically, the expert opinion from Dr. Goldberg creates a genuine dispute of material fact as to whether Dr. Heyd failed to properly carry out the recommendations from the hematology consultation at OSU, failed to properly

monitor plaintiff's INR, and failed to appropriately adjust Coumadin doses to achieve therapeutic

INRs. (Goldberg opinion, Doc. 99-1 at 6-7). *See Anthony*, 701 F. App'x at 464 (holding that in

order to satisfy the objective prong of an Eighth Amendment claim, a prisoner alleging

inadequate medical care generally must provide medical expert testimony establishing that his

symptoms would have been alleviated with alternative treatment) (citing *Santiago*, 734 F.3d at

591; *Blosser v. Gilbert*, 422 F. App'x 453, 461 (6th Cir. 2011)). *See also Rhinehart*, 894 F.3d at

738 (adequacy of medical care claims under the Eighth Amendment often require "'expert

medical testimony . . . showing the medical necessity for' the desired treatment and 'the

inadequacy of the treatments' the inmate received") (quoting *Anthony*, 701 F. App'x at 464).

Specifically, Dr. Goldberg opined:

> It is my opinion within a reasonable degree of medical certainty, Mr. Murray is a 35 year old male with multiple unprovoked deep venous thrombosis requiring Coumadin anticoagulation. A hematology consultation was performed in July 2011. Mr. Murray was considered to have hereditary Protein C and S deficiency. He had recurrent (3) unprovoked deep venous thrombosis. The hematology consultation suggested life long anticoagulation and recommended maintaining an INR between 2.5 and 3.0 on Coumadin. Unfortunately, Dr. Heyd as medical director failed to carry out these recommendations. Dr. Heyd and his staff of nurses allowed the INR to fall into subtherapeutic levels. Dr. Heyd failed to follow the hematology recommendations and failed to direct his nursing staff to appropriately adjust the Coumadin doses to achieve therapeutic INRs. Dr. Heyd failed to personally evaluate Mr. Murray when he was complaining of headaches and nausea which were signs and symptoms of cerebral edema. As a result of these failures which were breaches of the standard of care, Mr. Murray developed a cerebral venous thrombosis which was directly caused by failure to maintain therapeutic INR levels especially in view of his known hypercoagulable state (Protein S and Protein C deficiency). Mr. Murray suffered extensive venous thrombosis involving his right transverse sinus, right sigmoid sinus, and posterior portions of the superior and inferior sagittal sinuses in his brain. The thrombosis of his cerebral venous sinuses produced cerebral edema which caused symptoms of severe headaches and caused papilla edema which resulted in ocular blindness. Mr. Murray's blindness is permanent.

(Doc. 99-1 at 6-7). Accordingly, the Court concludes that plaintiff has satisfied the objective

prong of his Eighth Amendment claim.

## B. Deliberate indifference

### a. Dr. Heyd

Defendants argue that plaintiff has not established that Dr. Heyd delayed or failed to provide medical care amounting to deliberate indifference under the Eighth Amendment. (Doc. 96 at 31). Defendants argue that even if Dr. Heyd's treatment of plaintiff "amounted to medical malpractice, such malpractice is not sufficient to establish the subjective prong of Plaintiff's claim and does not rise to the level of a constitutional violation." (*Id.* at 32). To the extent plaintiff alleges that Dr. Heyd was deliberately indifferent in failing to monitor plaintiff's INR levels, defendants argue that Dr. Heyd was "diligent in ordering repeat blood draws, even when Plaintiff failed to appear for them, in order to ensure that Plaintiff received the appropriate dosage of Coumadin." (*Id.* at 33). For example, defendants argue that in November 2011, Dr. Heyd found that anticoagulation therapy was progressing properly and plaintiff had an INR level of 2.3. (Heyd Declaration at ¶ 17). On December 19, 2011, Dr. Heyd readjusted plaintiff's Coumadin dosage due to high INR test results on December 8, 2011 and December 14, 2011 and ordered another INR test to be conducted in two weeks, but no blood draw was ever conducted. (*Id.* at ¶ 18). By December 28, 2011, despite plaintiff's failure to show up to an appointment, Dr. Heyd ordered another INR test to be conducted in ten days. (*Id.* at ¶ 19; Doc. 96-5 at 5). Defendants argue that Dr. Heyd's failure to follow-up on unfulfilled requests to check plaintiff's INR levels constitutes at most medical negligence, which is not sufficient to establish deliberate indifference under the Eighth Amendment. (Doc. 96 at 33).

In response, plaintiff asserts there is no dispute that defendants were aware of his blood clotting condition, which was documented by his history of DVTs, anticoagulant medications, and the INR target level prescribed by the OSU hematologist. (Doc. 110 at 6). Plaintiff argues

that there is sufficient evidence from which a reasonable jury could conclude that Dr. Heyd disregarded a substantial risk of harm to plaintiff and is culpable for his injuries. (*Id.* at 7). Plaintiff argues that not one blood test in over seven months demonstrated compliance with the levels prescribed by OSU. (*Id.* at 11). In addition, plaintiff argues that his last recorded INR level was at 1.3 on December 22, 2011, and defendants thus permitted his INR levels to remain dangerously low for at least six weeks before his cerebral blood clot and hospitalization. (*Id.* at 7).

In reply, defendants argue that Dr. Goldberg's report does not provide a basis for a finding that defendants were deliberately indifferent to plaintiff's medical needs. (Doc. 119 at 2). Defendants argue that plaintiff's INR levels were below the target level on multiple other occasions between 2011 and 2013 and resulted in no adverse consequences. (*Id.* at 2-3).[6]

In this case, plaintiff has presented sufficient evidence creating a genuine issue of material fact as to whether Dr. Heyd was deliberately indifferent to plaintiff's blood clotting condition by allowing his INR levels to fall below target level and by failing to adjust his Coumadin medication accordingly. Dr. Heyd, the physician who provided plaintiff with medical care and treatment when he was incarcerated at LeCI, testified that he was aware of plaintiff's blood clotting condition and the OSU hematology directive from July 2011 that plaintiff be given a fair trial of Coumadin with an INR ranging between 2.5 and 3. (Heyd Deposition, Doc. 102 at 91-92). A "'prison official[ ] who ha[s] been alerted to a prisoner's serious medical needs [is] under an obligation to offer medical care to such a prisoner.'" *Richmond*, 885 F.3d at 942

---

[6] Defendants also argue that Dr. Fraunfelder's expert report should not be considered in deciding this motion for summary judgment because it does not comply with Fed. R. Civ. P. 26(a)(2)(B)(ii)'s requirement that the report contain "the facts or data considered by the witness in forming" his opinion. (Doc. 119 at 3-4). The Court rejects this argument because Dr. Fraunfelder's expert report specifically states that "in forming this decision, I reviewed medical records that included reports from November 2008 to November 2014. These records included ophthalmology reports as well as other types of subspecialist physician records." (Doc. 99-2 at 1).

(quoting *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). Dr. Heyd also testified that he was aware of the risk of harm that a low INR level had on plaintiff's medical condition. (Heyd Deposition, Doc. 102 at 79-80).

In light of Dr. Heyd's knowledge of plaintiff's serious medical condition and medical need to maintain INR levels between 2.5 and 3.0, the medical records demonstrate a genuine dispute of material fact as to whether Dr. Heyd consciously disregarded a substantial risk of harm to plaintiff's health by failing to properly monitor his INR levels during the months preceding his February 6, 2012 stroke. Prior to plaintiff's stroke, plaintiff's INR levels did not fall within the target range. On August 16, 2011, plaintiff had an INR level of 2.3. (Doc. 96-4 at 10). On November 15, 2011, plaintiff's INR level remained at 2.3. (*Id.*). On November 30, 2011, plaintiff's INR level dropped to 2.1. (Doc. 110-2 at 1). Finally, on December 22, 2011, plaintiff's INR level fell to 1.3, which was the last recorded INR level until his cerebral blood clot and hospitalization in February 2012. (Doc. 110-3 at 1). On December 28, 2011, despite plaintiff's 1.3 INR level, Dr. Heyd continued plaintiff on his current dosage of Coumadin. (Doc. 96-5 at 5). In early 2012, plaintiff complained of persistent headaches and nausea, which, according to Dr. Goldberg, are signs and symptoms of cerebral edema. (Doc. 99-1 at 7).

Moreover, Dr. Goldberg's expert report demonstrates a genuine dispute of material fact as to whether Dr. Heyd consciously disregarded a substantial risk of harm to plaintiff's health by failing to properly monitor his INR levels during the months preceding his February 6, 2012 stroke. Dr. Goldberg reviewed plaintiff's medical records and opined that Dr. Heyd failed to carry out the hematology recommendations that plaintiff receive lifelong anticoagulation therapy with an INR between 2.5 and 3.0. (Doc. 99-1 at 6). Dr. Heyd's failure to carry out these recommendations allowed plaintiff's INR to fall into subtherapeutic levels, and Dr. Heyd failed

to adjust plaintiff's Coumadin doses appropriately to achieve therapeutic INR levels. (*Id.* at 7). Dr. Goldberg opined that plaintiff's cerebral venous thrombosis was a direct cause of Dr. Heyd's failure to maintain therapeutic INR levels. (*Id.*). Based on the medical records and Dr. Goldberg's expert report, a reasonable jury could find that Dr. Heyd was deliberately indifferent in failing to adequately monitor plaintiff's INR levels and adjust his Coumadin dosage accordingly.

The Court notes that "[a] prison doctor's failure to follow an outside specialist's recommendation does not necessarily establish inadequate care." *Rhinehart*, 894 F.3d at 742. "When a 'doctor orders treatment consistent with the symptoms presented and then continues to monitor the [prisoner's] condition, an inference of deliberate indifference is unwarranted." *Id.* at 743. The Sixth Circuit has held that an inmate may not proceed past summary judgment on an Eighth Amendment deliberate indifference claim where prison doctors "prescribed an alternate treatment" from that of an outside specialist and the inmate produced no medical proof showing that the alternate treatment was inadequate. *See id.* at 742; *Santiago*, 734 F.3d at 591. That is not the case here. Here, plaintiff has produced evidence creating a genuine dispute of fact as to whether Dr. Heyd failed to order treatment consistent with plaintiff's DVT and likewise failed to monitor his INR levels and adjust his Coumadin accordingly to treat his condition. In addition, plaintiff's evidence (Dr. Goldberg's report) establishes an issue of fact that the sparse treatment and monitoring plaintiff received was inadequate.

Defendants argue that the evidence establishes at most that Dr. Heyd was negligent, which is insufficient to establish deliberate indifference. (Doc. 96 at 33). Defendants argue that Dr. Heyd sent numerous requests for plaintiff's INR levels to be checked, but apparently failed to follow-up with these requests. (*Id.*). Defendants argue that plaintiff is "unable to show that

any lapse in his INR testing was anything other than inadvertent." (*Id.*). Defendants cite to *Hendricks v. Desmarais*, a Southern District of Ohio case holding that a prisoner established no more than negligence on his Eighth Amendment claim in light of prison officials' requests to fill the prisoner's medication, but failure to follow-up on those requests. No. 2:11-cv-937, 2013 WL 4536962, at *6 (S.D. Ohio Aug. 27, 2013). The Court noted that "these failures constitute medical negligence rooted in a lack of follow-through, a failure to adequately review the file, and miscalculation." *Id.* Although the record contains instances of Dr. Heyd's unfulfilled requests for plaintiff's INR levels to checked, the evidence presented by plaintiff still creates a genuine dispute of material fact beyond mere "lack of follow-through." On December 22, 2011, plaintiff's INR level was 1.3, well outside the prescribed range of 2.5 to 3.0. (Doc. 110-3 at 1). Despite knowledge of this subtherapeutic level, six days later, Dr. Heyd ordered that plaintiff continue on his current dosage of Coumadin, and he failed to ensure that plaintiff's INR levels were checked ever again. (Doc. 96-5 at 5). Plaintiff also presented to Dr. Heyd on January 31, 2012 with symptoms of viral and gastrointestinal illness. (*Id.*). Dr. Heyd acknowledged that a PT/INR test was "overdue." (*Id.*).

Defendants also assert that plaintiff was frequently noncompliant with treatment and did not show up for his appointment or blood draw with Dr. Heyd on December 28, 2011 or his nursing appointment to check INR levels on January 18, 2012. Throughout plaintiff's incarceration, defendant Heyd became concerned that plaintiff was not compliant in taking his Coumadin. (Heyd Declaration at ¶ 9). Defendant Heyd questioned whether plaintiff was consistently taking his anti-coagulation pills due to his wide-ranging INR levels. (*Id.*). According to defendants, the record contains many documented instances where plaintiff refused medications, refused INR blood tests, and disregarded medical advice. (*Id.*). For example, on

March 16, 2011 and May 25, 2011, plaintiff refused a blood draw to test his INR levels. (Heyd Declaration at ¶¶ 10-11; Doc. 96-2 at 230-31). On July 2, 2011, plaintiff refused IV hydration at Franklin Medical Center. (Heyd Declaration at ¶ 12; Doc. 96-2 at 13). On August 16, 2011, plaintiff was determined to not be compliant in taking his medications. (Heyd Declaration at ¶ 13; Doc. 96-4 at 10). On December 22, 2011, medication sheets indicated that plaintiff refused his Coumadin. (Heyd Declaration at ¶ 14; Doc. 96-5 at 23-24). On February 5, 2012, plaintiff failed to take his evening medications. (Heyd Declaration at ¶ 15). In their reply brief, defendants submit further evidence of plaintiff's alleged non-compliance with treatment for his anticoagulation disorder after his release from prison. (Doc. 119-1).

Plaintiff, however, has presented evidence disputing defendants' allegations of non-compliance. Plaintiff attests that he did not knowingly miss any scheduled blood draws or refuse any blood draws. (Plaintiff Declaration, Doc. 100 at ¶ 2). Because of his blood clotting disorder, plaintiff knew that it was important for him to have his blood tested regularly. (*Id.* at ¶ 3). Plaintiff believed that he needed to sign a form documenting medical treatment refusal. (*Id.* at ¶ 4). Plaintiff does not recall that he ever signed a form refusing a blood draw or other medical treatment. (*Id.*). Plaintiff also believed that he would be punished for refusing a blood draw or refusing to sign a form. (*Id.* at ¶ 5). Plaintiff was never punished for refusing a blood draw or refusing to sign a form. (*Id.*). Plaintiff also knew that it was important to take his medication for his blood clotting condition. (*Id.* at ¶ 6). If plaintiff missed any medications, it was because he was too sick with a migraine headache or other illness to pick up the medications. (*Id.*).

In addition, Dr. Golderg's expert report is further evidence that creates a genuine factual dispute regarding plaintiff's alleged non-compliance. Dr. Goldberg wrote:

> Mr. Murray has been characterized as a non compliant patient in the contained records available. I reviewed the medication records and found that Mr. Murray

never missed a dose of Coumadin in the month January 2012 but did miss Coumadin on February 5 and 6 for unknown reasons. Thus, Mr. Murray was very compliant in taking Coumadin but Dr. Heyd and the nursing staff failed to give him the therapeutic dose.

(Doc. 99-1 at 7). Thus, plaintiff's evidence creates a genuine issue of fact as to whether plaintiff's noncompliance or the subtherapeutic dose of medication prescribed by Dr. Heyd, despite plaintiff's low INR levels, caused plaintiff's cerebral venous thrombosis.[7] Accordingly, plaintiff has adduced sufficient evidence raising genuine issues of fact that Dr. Heyd was deliberately indifferent by failing to properly treat his blood clotting condition. Defendants' motion for summary judgment should be denied as to Dr. Heyd.

### b. Nurses Benner, Hodges-Begunich, and Carnes

Defendants argue that plaintiff has failed to establish that Nurses Carnes, Benner, and Hodges-Begunich were deliberately indifferent in the course of his medical treatment. (Doc. 96 at 39). Defendants argue that these nurses treated plaintiff for the symptoms that they observed at the time of the treatment and did not "callously ignore" plaintiff's medical condition. (*Id.* at 40). Defendants argue that even if the nurses' diagnoses were ultimately incorrect, their "treatment represented a reasoned, good-faith effort to treat [plaintiff's] symptoms." (*Id.*) (quoting *Shade v. City of Middletown*, 200 F. App'x 566, 570 (6th Cir. 2006)).

Plaintiff has not presented any evidence demonstrating that Nurses Carnes, Benner, and Hodges-Begunich consciously disregarded a serious risk of harm to his thrombosis condition.

The evidence shows that on January 20, 2012 and January 23, 2012, Nurse Benner treated plaintiff for migraine headaches, sinus drainage, coughing, a scratchy throat, and vomiting. (Doc. 96-4 at 5-8; Benner Declaration at ¶¶ 5-6). Nurse Benner assessed cold

---

[7] It is unclear to the Court how defendants' submission of evidence of plaintiff's non-compliance with treatment post-dating his February 2012 stroke rebuts plaintiff's evidence of compliance during the relevant time period preceding the stroke. (*See* Doc. 119-1).

symptoms on both visits and provided plaintiff with ibuprofen, cough syrup, and cold tablets. (*Id.*). Nurse Benner made a referral for plaintiff to see the LeCI doctor. (Benner Declaration at ¶ 6; Doc. 96-4 at 6 "Dispositive: Advance provider appointment"; Doc. 106, Benner Depo. at 25-26: testifying that "advanced provider treatment" meant that plaintiff was referred to the doctor "[b]ecause it's pretty much outside of my scope at that point."). On January 28, 2012, Nurse Hodges-Begunich treated plaintiff for migraine headaches and vomiting. (Doc. 96-4 at 3-4; Hodges Begunich Declaration at ¶ 6). She provided plaintiff with ibuprofen and clorphen and made another referral for plaintiff to see the LeCI physician. (*Id.*). On February 3, 2012, plaintiff complained to Nurse Carnes that he felt woozy and his leg hurt. (Doc. 96-4 at 1). Nurse Carnes offered plaintiff Tylenol and observed that he presented health-seeking behaviors and anxiety. (*Id.*). Nurse Carnes observed plaintiff talking to other inmates in the infirmary without any signs or symptoms of pain or discomfort. (Doc. 96-4 at 2). Nurse Carnes advised plaintiff to use meditation, relaxation, and over-the-counter medication to relieve his pain. (*Id.*).

None of this evidence creates a genuine issue of fact as to whether Nurses Benner, Hodges-Begunich, and Carnes "consciously expos[ed] [plaintiff] to an excessive risk of serious harm." *Rhinehart*, 894 F.3d at 738-39. Each nurse defendant did not ignore the complaints plaintiff presented on the days he was seen by the nurses; rather, each personally examined plaintiff and provided treatment for the outward manifestations of his symptoms. *See Shade*, 200 F. App'x at 520. Although Dr. Goldberg's report states that Dr. Heyd's nursing staff "allowed the INR to fall into subtherapeutic levels," the report is insufficient to establish the subjective component of an Eighth Amendment claim. *See Reed v. Speck*, 508 F. App'x 415, 420 (6th Cir. 2012) (expert testimony is insufficient to establish the subjective component because prison officials' conduct is judged by what they actually knew, not what a reasonable person in their

shoes would be known). Unlike the evidence presented in support of his Eighth Amendment claim against Dr. Heyd, plaintiff has not presented evidence that Nurses Benner, Hodges-Begunich, and Carnes were responsible for prescribing or adjusting plaintiff's warfarin even if they were aware that plaintiff's dosage was subtherapeutic given his INR levels. No reasonable jury could find that Nurses Benner, Hodges-Begunich, and Carnes were deliberately indifferent to plaintiff's medical needs on January 20, 23, 28, and February 3, 2012. Rather, the medical evidence establishes at most "mere negligence in diagnosis or treatment," which is not actionable under § 1983." *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 976 (6th Cir. 2012) (quoting *Clark v. Corrs. Corp. of Am.*, 98 F. App'x 413, 416 (6th Cir. 2004)). This rationale applies even if the misdiagnosis "results in an inadequate course of treatment and considerable suffering." *Dotson v. Wilkinson*, 477 F. Supp. 2d 838, 848 (N.D. Ohio 2007) (citing *Gabeheart v. Chapleau*, 110 F.3d 63, 1997 WL 160322, at *2 (6th Cir. 1997)). Accordingly, defendants' motion for summary judgment should be granted as to defendants Benner, Hodges-Begunich, and Carnes.

### c. Amy Weiss

Defendants argue that plaintiff cannot establish an Eighth Amendment deliberate indifference claim against Health Care Administrator Amy Weiss because she never treated plaintiff as a physician or a nurse during his incarceration. (Doc. 96 at 42). Defendants also argue that plaintiff's claims against Amy Weiss regarding her involvement in the grievance process are not actionable under § 1983. (*Id.* at 49-50).

In response, plaintiff argues that Amy Weiss was personally involved in the "gross mishandling" of his medical treatment. (Doc. 110 at 12). Plaintiff contends that Amy Weiss is "responsible for overseeing the day-to-day operations of the medical infirmary, pharmacy, and

lab." (*Id.* at 13) (citing Deposition of Amy Weiss, Doc. 104 at 6). Plaintiff contends that she had the responsibility to correct the problem if medical staff failed to perform a blood draw or failed to timely test a blood sample or report the problem. (*Id.*). Plaintiff argues that "[b]y virtue of being in charge, in the face of these gross inadequacies in treatment, Defendant Weiss implicitly authorized or approved the deliberate indifference that resulted in [his] blood clot and blindness." (*Id.*).

Section 1983 liability "cannot be premised solely on a theory of respondeat superior, or the right to control employees." *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). Further, an alleged failure to intervene on the plaintiff's behalf is insufficient to support the imposition of liability under § 1983 for a violation of the plaintiff's constitutional rights. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). To impute liability onto supervisory personnel under § 1983, plaintiff must show "that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Taylor v. Larson*, 505 F. App'x 475, 478 (6th Cir. 2012) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *see also Meeks v. Schofield*, 625 F. App'x 697, 702 (6th Cir. 2015) (to establish supervisory liability under § 1983, the plaintiff must prove that the supervisory official was personally responsible for or actively participated in the alleged unconstitutional actions that caused his injury) (citing *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008)). Moreover, several courts have rejected Eighth Amendment claims against prison health care administrators because "they were not medical professionals, they were not personally involved with the prisoners' medical treatment, or they lacked authority to override the treating physicians' medical decisions setting the prescribed course of treatment for the prisoner-plaintiffs." *Brown v. Wilson*, No. 6:11-00189, 2012 WL 639475, at *4 (E.D. Ky. Feb. 27, 2012).

Plaintiff has failed to create a genuine issue of fact as to whether defendant Amy Weiss was deliberately indifferent to his medical needs. Plaintiff has failed to present evidence that defendant Weiss had any knowledge of his medical condition or was personally involved in any decisions relating to his medical treatment. Rather, plaintiff seeks to impute liability on Amy Weiss under the theory of respondeat superior based on the medical staff's failure to perform regular blood draws to monitor plaintiff's condition. Accordingly, summary judgment should be granted as to defendant Weiss.

## V. Dr. Heyd is not entitled to qualified immunity.

The qualified-immunity doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Al-Lamadani v. Lang*, 624 F. App'x 405, 409 (6th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court conducts a two-step inquiry when considering a claim for qualified immunity. *Id.* (citing *Pearson*, 555 U.S. at 232). At the first step, the court asks whether the facts viewed in the light most favorable to the plaintiff show that the defendant has violated the plaintiff's constitutional right. *Id.* (citing *Pearson*, 555 U.S. at 232). At the second step, the court asks whether the right was clearly established at the time of the violation. *Id.* (citing *Pearson*, 555 U.S. at 232). "A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (internal quotation marks, citation, and alterations omitted)). The court may consider the two steps of the inquiry in the order it chooses. *Id.* (citing *Pearson*, 555 U.S. at 242). Plaintiff has the burden to show that a defendant is not entitled to qualified

immunity. *Id.* (citing *O'Malley v. City of Flint*, 652 F.3d 662, 667 (6th Cir. 2011)).

Whether the law was clearly established is evaluated "at the time of the challenged conduct." *Ashcroft v. Abdullah Al-Kidd*, 563 U.S. 731, 741 (2011); *see also Hansen v. Aper*, 746 F. App'x 511, 517 n.3 (6th Cir. 2018). In deciding whether the right was clearly established, the Supreme Court has cautioned lower courts "not to define clearly established law at a high level of generality." *Abdullah Al-Kidd*, 536 U.S. at 742. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *O'Malley*, 652 F.3d at 667 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

As determined above, plaintiff has produced sufficient evidence raising genuine issues of fact as to whether Dr. Heyd violated his Eighth Amendment rights and was deliberately indifferent to his medical condition by failing to properly monitor his INR levels. Thus, the Court must next address whether this right clearly established at the time of the violation.

Defendants argue that plaintiff's medical treatment was not contrary to clearly established law because plaintiff is unable to show that Dr. Heyd's actions were "plainly incompetent" or that Dr. Heyd "knowingly violated the law." (Doc. 96 at 62) (quoting *Mitchell v. Schlabach*, 864 F.3d 416, 424 (6th Cir. 2017)). Plaintiff argues that his deliberate indifference claim is clearly established by Sixth Circuit cases recognizing a prisoner's constitutional right to not have necessary medication withheld or delayed and Sixth Circuit cases recognizing a constitutional violation for neglecting a prisoner's medical needs and interrupting a prescribed plan of treatment. (Doc. 110 at 19-20) (citing *Canady v. Wilkinson*, 90 F. App'x 863 (6th Cir. 2004); *Dozier v. Pauley*, 24 F. App'x 398, 400 (6th Cir. 2001); *Terrance v. Northville Reg'l*

*Psychiatric Hosp.*, 286 F.3d 834, 845 (6th Cir. 2002); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991)).

As the Sixth Circuit has recently explained:

> For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Comstock*, 273 F.3d at 702 (quoting *Anderson*, 483 U.S. at 640). However, we need not "find a case in which 'the very action in question has previously been held unlawful,' but rather, 'in the light of pre-existing law, the unlawfulness must be apparent.'" *Id.* (alterations and citation omitted). The proposition that deliberate indifference to a prisoner's medical needs can amount to a constitutional violation has been well-settled since *Estelle* in 1976." *Parsons*, 491 F. App'x. at 602. . . . Further, as noted above, this Circuit's precedent is clear that neglecting a prisoner's medical need and interrupting a prescribed plan of treatment can constitute a constitutional violation. *See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844-45 (6th Cir. 2002); *Comstock*, 273 F.3d at 702; *Boretti*, 930 F.2d at 1154. Thus, it was clearly established at the time of [plaintiff's] incarceration . . . that neglecting to provide a prisoner with needed medication . . . and failing implement the prescribed plan of treatment could constitute a constitutional violation.

*Richmond*, 885 F.3d at 947-48. It was clearly established at the time of plaintiff's incarceration that Dr. Heyd's failure to monitor plaintiff's INR levels and adjust his Coumadin accordingly could constitute a constitutional violation. Thus, Dr. Heyd is not entitled to qualified immunity.

## VI. Plaintiff Properly Exhausted his Administrative Remedies against Dr. Heyd.

Exhaustion of administrative remedies "is mandatory under the [Prison Litigation Reform Act ("PLRA")] and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "[A] prisoner confined in any jail, prison, or other correctional facility" is barred from filing a lawsuit alleging constitutional violations under 42 U.S.C. § 1983 "or any other Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

"A prisoner's failure to exhaust his intra-prison administrative remedies prior to filing suit 'is an affirmative defense under the PLRA.'" *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (quoting *Jones*, 549 U.S. at 216). "[T]he failure to exhaust 'must be established by the defendants.'" *Id.* (quoting *Napier v. Laurel Cty., Ky.*, 636 F.3d 218, 225 (6th Cir. 2011)). Thus, defendants bear the burden of proof on exhaustion. *Id.* Because defendants bear the burden of persuasion on exhaustion, their "initial summary judgement burden is 'higher in that [they] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Id.* at 455-56 (quoting *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (in turn quoting 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000))).

The PLRA exhaustion requirement means prisoners must carry out "proper exhaustion" of a grievance. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "To properly exhaust a claim, prisoners must tak[e] advantage of each step the prison holds out for resolving the claim internally and by following the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quoting *Woodford*, 548 U.S. at 90)). "Proper exhaustion [further] demands compliance with an agency's deadlines. . . ." *Woodford*, 548 U.S. at 90. Proper exhaustion serves the necessary interest of providing "fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint."

*LaFountain v. Martin*, 334 F. App'x 738, 740 (6th Cir. 2009) (citing *Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006)).

The procedure established for resolving inmate complaints in Ohio, codified in Ohio Admin. Code § 5120-9-31, involves a three-step process. First, the inmate is required to file an informal complaint with the direct supervisor of the staff member within fourteen days of the event giving rise to the complaint. Ohio Admin. Code § 5120-9-31(K)(1). Second, if the inmate is unsatisfied with the response to his informal complaint he may file a formal grievance with the inspector of institutional services at his institution of confinement. Ohio Admin. Code § 5120-9-31(K)(2). The inspector of institutional services is required to provide a written response to the inmate's grievance within fourteen calendar days of receipt of the grievance. *Id.* If the inmate is dissatisfied with the response, he may undertake the third step of the grievance process and file an appeal to the office of chief inspector of the ODRC within fourteen days of the disposition of the formal grievance. Ohio Admin. Code § 5120-9-31(K)(3).

Defendants argue that plaintiff failed to exhaust his administrative remedies because he failed to specifically name Dr. Heyd in his informal complaint filed on February 29, 2012, his grievance filed on March 22, 2012, or his appeal filed on April 2, 2012. (Doc. 96 at 56-57). Defendants argue that plaintiff's generic reference to the "medical department" and "medical staff" in his informal complaint, grievance, and appeal is insufficient. (*Id.* at 57). Defendants argue that plaintiff's "failure to name [Dr. Heyd] in his informal complaint, as required by Ohio Admin. Code § 5120-9-31(K), means that [plaintiff] failed to properly exhaust his administrative remedies with regard to [Dr. Heyd]." (*Id.*).

In response, plaintiff argues that under the Sixth Circuit's precedent in *Reed-Bey*, 603 F.3d at 325, his failure to specifically include Dr. Heyd's name in the grievance is

inconsequential because he received a merits-based response at all three stages of the grievance process. (Doc. 110 at 14).

The Court concludes that plaintiff properly exhausted his administrative remedies against Dr. Heyd under applicable Sixth Circuit law. In *Reed-Bey*, the Sixth Circuit held that a prisoner properly exhausted his administrative remedies even though he failed to comport with the prison's grievance procedures by omitting the names of the prison officials that were the subject of his grievance. 603 F.3d at 325. The Sixth Circuit explained that because the prison "opted to dismiss his grievance on the merits rather than invoke its procedural bar," the prisoner properly exhausted his claim. *Id.* at 323. Thus, the Sixth Circuit held as a matter of law that "[w]hen prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will we." *Id.* at 325. In this case, the grievance documents establish that plaintiff properly filed an informal complaint, a grievance, and an appeal as required by Ohio Admin. Code § 5120-9-31(K). (Doc. 96-1). Plaintiff received a merits-based response at *each step* of the process, rather than a response procedurally barring his complaints for failing to specifically name Dr. Heyd. (Doc. 96-1 at 1, 3, 6-7). *Cf. Cook* v. *Caruso*, 531 F. App'x 554, 563 (6th Cir. 2013) (declining to apply *Reed-Bey* because the evidence established that plaintiff did not receive a merits-based response at *each step* of the grievance process); *Swank v. Hale*, No. 2:12-cv-1031, 2016 WL 1156517, at *7 (S.D. Ohio Mar. 24, 2016) (same). Because plaintiff received a merits-based response at *each step* of the three-step process outlined in Ohio Admin. Code § 5120-9-31(K), he properly exhausted his administrative remedies even though he failed to specifically name Dr. Heyd.[8]

---

[8] The Court notes that while plaintiff's documents did not identify Dr. Heyd by name, each of the responses to plaintiff's submissions identify Dr. Heyd by name and relate his involvement in plaintiff's medical care. (Doc. 96-1).

**VII. Plaintiff's First Amendment Retaliation claims against Dr. Heyd and Amy Weiss should be dismissed.**

Defendants Heyd and Weiss also move for summary judgment on plaintiff's First Amendment retaliation claim. (Doc. 96 at 42-48). In his amended complaint, plaintiff alleges that defendants Heyd and Weiss retaliated against him for pursuing his complaint and grievance by denying him necessary medical treatment and testing, providing false testimony with respect to his compliance with prior treatment and testing, and falsifying and/or suborning the falsification of his medical records. (Amended Complaint, Doc. 61 at ¶ 102).

In opposing defendants' properly supported motion for summary judgment, plaintiff must "designate specific facts in affidavits, depositions, interrogatories, or other factual material" from which a reasonable jury could find in his favor. *Maston v. Montgomery Cty. Jail Medical Staff Personnel*, 832 F. Supp.2d 846, 849 (S.D. Ohio 2011). "A plaintiff is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Id.* Plaintiff's unsworn amended complaint, which was not signed under penalty of perjury, does not constitute evidence to show that there is a genuine issue of material fact for trial. (*See* Doc. 61); *see Maston*, 832 F. Supp.2d at 851-52. In addition, plaintiff has provided no response in opposition to defendants' motion for summary judgment on his First Amendment retaliation claim. (*See* Docs. 110, 114). Thus, because plaintiff has failed to submit any evidence creating a genuine issue of fact as to whether defendants retaliated against him in violation of the First Amendment for filing complaints and grievances, summary judgment should be granted to defendants Heyd and Weiss on plaintiff's First Amendment retaliation claim.

### VIII. Conclusion

Based on the foregoing, it is **ORDERED** that:

1. Plaintiff's motion to strike (Doc. 111) be **GRANTED in PART** and **DENIED in PART.**

It is **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Doc. 96) be **DENIED** as to plaintiff's Eighth Amendment claim against Dr. Heyd and be **GRANTED** as to plaintiff's Eighth Amendment claim against all other defendants and plaintiff's First Amendment retaliation claim.

**IT IS SO RECOMMENDED.**

Date: 2/7/19

Karen L. Litkovitz
United States Magistrate Judge

JAMAL MURRAY,                                Case No: 1:14-cv-168
    Plaintiff,                               Black, J.
                                             Litkovitz, M.J.

    vs.

OHIO DEPARTMENT OF
CORRECTIONS, et al.,
    Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).